IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

ANNA F. SHEETS,

      Plaintiff,

v.
                            Civil Action No. 1:11CV148
                            (The Honorable Irene M. Keeley)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant," and sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f.  The matter is awaiting decision Plaintiff's Motion for Judgment on the Pleadings and Defendant's Motion for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. Procedural History

Anna F. Sheets ("Plaintiff") protectively filed her current applications for DIB and SSI benefits on June 18, 2009, and filed the applications on June 25, 2009, claiming she was disabled since January 1, 2008, due to neck and back problems, "hands go numb," and migraine headaches (R. 146-58, 199).  The West Virginia state agency denied her claims initially and on reconsideration

(R. 72-75). At Plaintiff's request, an administrative hearing was conducted by Michelle Wolfe, Administrative Law Judge ("ALJ"), on September 8, 2010, and at which Plaintiff and Nancy Shapiro, a Vocational Expert ("VE"), testified (R. 26-71). On December 2, 2010, the ALJ issued a decision finding that Plaintiff could perform a limited range of light work and, therefore, was not disabled within the meaning of the Act (R. 11-20). Subsequent to the decision by the ALJ, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-4).

## II. Statement of Facts

Plaintiff was born on March 21, 1968, and was forty-one (41) years old when she filed her applications (R. 146-58). Plaintiff completed the tenth grade of high school and then received her GED (R. 33). Plaintiff's previous work history includes assistant manager at a fast-food restaurant, cook at a restaurant, and housekeeper at a resort (R. 200).

Degenerative changes were noted in Plaintiff's cervical and thoracic spine on May 6, 2003. The MRI showed "intervertebral disk space narrowing at C6-7" and osteophyte formation "with signal loss in the disk." Annular bulging and "mild disk space narrowing [was] seen at T8-9 and T9-10," but the "signal intensity within the cord [was] within normal limits" (R. 628).

On January 27, 2009, Plaintiff reported to Dr. Jarrett that she'd had five (5) migraines in the past two (2) weeks, neck pain, hand numbness and tingling, and arm swelling (R. 343, 619). Dr. Jarrett's examination of Plaintiff showed Plaintiff was in no acute distress; she was alert and oriented; she was anxious and depressed; her memory was intact; her mood and affect were normal; her HEENT exam was normal; her neck was supple and she had no JVD; she had no adenopathy of her neck; and her cardiovascular exam was normal. Dr. Jarrett diagnosed neck pain and ordered an

2

MRI of Plaintiff's neck (R. 359).

Dr. Jarrett diagnosed neck pain, prescribed Mobic, and ordered x-rays of Plaintiff's cervical spine on March 19, 2009 (R. 342).

Plaintiff's March 23, 2009, x-ray of her cervical spine showed "[a]symmetric disc space loss and minor osteophyte change . . . visible at C6-C7. The neuroforamen appear patent . . . . No acute bony abnormality demonstrated. Odontoid tip obscured" (R. 344, 371, 625).

On April 14, 2009, an MRI was taken of Plaintiff's cervical spine. It showed a "superimposed central disc herniation at C6-7" and "bilateral foraminal narrowing due to osteophytes at C6-7." The MRI also showed "a small central disc herniation with effacement of the thecal sac" at C5-C6. The "signal intensity within the cord [was] normal." The impression was for "degenerative change with small central discs at C6-7 and C5-6" (R. 270, 345, 621, 626).

On April 23, 2009, Plaintiff reported to Dr. Jarrett that she experienced shooting pain down her arm, "especially [with] lifting." She stated her arm and neck were swollen (R. 339, 615). Upon examination, Dr. Jarrett noted Plaintiff's grips were good. Dr. Jarrett referred Plaintiff to a neurosurgeon (R. 340, 616).

On May 8, 2009, Plaintiff reported to Dr. Jarrett that she had an appointment with Dr. Bailes, a neurosurgeon, on June 1, 2009 (R. 337, 613). Dr. Jarrett prescribed Ultracet (R. 338, 614).

On June 1, 2009, Dr. Bailes examined Plaintiff for chronic neck pain. Plaintiff stated she experienced "numbness radiating also to the right upper extremity along the ulnar distribution." Plaintiff "denie[d] any left upper extremity complaints." Plaintiff stated she experienced headaches "associated" with her pain symptoms. Plaintiff informed Dr. Bailes that "NSAIDs as well as trigger point injections in the past seemed to have given her temporary relief." Plaintiff also stated that

"antispasmodic medication seem[ed] to relieve her symptoms."  Dr. Bailes reviewed Plaintiff's cervical MRI and noted it "state[d] a small central disk herniation at C5-C6 and C6-C7 levels with degenerative disk changes."  Plaintiff informed Dr. Bailes that she medicated with cyclobenzaprine, Prevacid, Mobic, Wellbutrin and Ultram (R. 294, 623).  Plaintiff stated she did not consume alcohol; she smoked one (1) pack of cigarettes per day.  Dr. Bailes review of Plaintiff's systems produced normal results.  Upon examination, Dr. Bailes noted Plaintiff was in no distress; her heart rate was regular; her pulses were palpable and symmetric; her lungs were clear to auscultation; her gait was steady; her motor and sensory functions were intact; her reflexes were intact; her muscle tone was unchanged; she was alert and oriented; she had no "long tract findings"; her cranial nerves were intact; her language was clear and coherent; and she was goal oriented.  Dr. Bailes diagnosed a "C5-C6 and C6-C7 herniated nucleus pulposus."  Dr. Bailes opined Plaintiff was a "good candidate to undergo a C5-C6 and C6-C7 anterior cervical diskectomy with fusion and plating."  Plaintiff consented to the procedure (R. 295, 627).

On June 10, 2009, Plaintiff was prescribed Ultram  and Prevacid by a physician at Pocahontas Medical Practice (R. 336).

On June 16, 2009, Plaintiff was prescribed Prevacid and Ultram from a physician at Pocahontas Medical Practice  (R. 612).

Plaintiff's June 24, 2009, chest x-ray was normal, except it showed "old rib fractures on the right" (R. 296).

On July 17, 2009, a physician from PMH Medical Practice completed a "Physician's Summary" of Plaintiff, opining Plaintiff's prognosis was "fair," her length of disability was "3 months," and her employment limitation was "total" (R. 282, 609).

On July 31, 2009, Plaintiff was admitted to Pocahontas Memorial Hospital with complaints of hypokalemia, abdominal pain, and depression and anxiety (R. 396). Plaintiff also complained of cervical pain (R. 403). She informed the physician she could not afford her prescription medication for cervical pain because she had no medical card; she had stopped taking all medications. Plaintiff reported she took "a lot of [T]ylenol for pain." Upon examination, Plaintiff's abdomen was not tender (R. 398). Plaintiff stated she experienced neck pain and pain at the center of her back (R. 444). Plaintiff was alert and oriented; her memory was intact; she appeared anxious and depressed; she had no ataxia; she had "CVA tenderness"; she had no adenopathy of her neck; her digits were normal (R. 407). The doctor diagnosed neck pain, abdomen pain, and hypokalemia (R. 398). Plaintiff was medicated with Protonix, Wellbutrin, Prevacid, Motrin, Klor-Con, Nicoderm and Ultram (R. 398, 415, 437). After treatment, Plaintiff stated she "[felt] much better," and the doctor noted Plaintiff's abdomen pain and hypokalemia had "improved" (R. 397). Prior to release on August 1, 2009, Plaintiff stated she experienced no pain; she was oriented, times three (3); her examination produced normal results (R. 396, 447-49).

The July 31, 2009, CT scan of Plaintiff's abdomen was negative (R. 411). Plaintiff's chest x-rays were normal (R. 412).

On August 1, 2009, Dr. Caroline Williams completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Williams noted the following: "[f]ailure to cooperate in that claimant did not return fx/ppq forms . . . . Unable to judicate case secondary to insufficient evidence to properly assess severity of claimant's allegations" (R. 278).

On August 5, 2009, Dr. Jarrett noted Plaintiff's hypertension was uncontrolled, ordered a hepatitis C screening, and prescribed Neurontin for Plaintiff's neck pain (R. 352).

Plaintiff was initially evaluated by Dr. Jewell, at Seneca Health Services, Inc., on August 12, 2009. Plaintiff stated she was depressed. Plaintiff informed Dr. Jewell that she was "having some problems getting her medications, and her chronic pain [was] actually well treated with Neurontin, but she [could not] get that off the patient assistance program." Plaintiff reported no manic or psychotic symptoms. She stated she had medicated with Wellbutrin "for years" and it did not "seem to be helping." Plaintiff stated she had lost interest "in things she used to enjoy, decreased energy, inability to concentrate . . . ." Plaintiff medicated with Wellbutrin, atenolol, Prevacid, Baclofen, and Mobic. Plaintiff informed Dr. Jewell that she had experienced "emotional abuse since 16 years by her boyfriend"; she was unemployed; she was a single mother of two girls and one boy; she had her GED. Plaintiff reported she had not consumed alcohol for three (3) months; she had "[had] three DUI's (sic) and incarceration when drinking." Plaintiff reported using "pot and pain pills" one (1) year ago (R. 581).

Plaintiff reported loss of appetite, chronic fatigue, weight loss, sinus "trouble," high blood pressure, "chest pain secondary to tachycardia," persistent nausea and vomiting, indigestion, heartburn, frequent urination, excessive moodiness, nervousness, depression, arthritis, rheumatism, recurrent back pain, chest pain, frequent "tension type headaches," and numbness and tingling sensations in her arms. Upon examination, Plaintiff's behavior/attitude/demeanor were cooperative and appropriate; her speech was normal; her affect was full and her mood was euthymic; her thought process and content were normal; her perception was normal; she was alert and oriented as to person, place, time and purpose of visit; her attention was satisfactory; her insight and judgment were intact; and she was forward thinking and goal oriented with no suicidal or homicidal thoughts. Dr. Jewell diagnosed major depressive disorder (Axis I); chronic pain, gastroesophageal reflux disease,

hypertension, and tachycardia (Axis III); mild to moderate psychosocial stressors (Axis IV); and GAF 58 (Axis V). Dr. Jewell provided samples of Cymbalta, which, he noted, "may help her pain." Dr. Jewell noted he was going to "try to get her on the patient assistance program Neurontin which may help her get off opiates" (R. 582).

On September 9, 2009, Plaintiff presented to Dr. Jewell for follow-up treatment. Plaintiff was medicating with Cymbalta. She reported "everything ha[d] been going well, and she did get her medical card and [was] able to afford her surgery and may be having a consultation soon." Plaintiff was ambulatory, cooperative, and appropriate. Her affect was full; her mood was euthymic; her thought process and content were normal; her perception and attention were normal; she was alert and oriented, times four (4); her attention was satisfactory; she was not homicidal or suicidal. Dr. Jewell diagnosed major depressive disorder and prescribed Cymbalta. Dr. Jewell noted that the Seneca Health Services, Inc., had provided Plaintiff Neurontin through its patient assistance program and that "she ha[d] been doing well on this medication." Additionally, Plaintiff's response to the treatment she had been receiving at Seneca Health Services, Inc., had been "good" (R. 579).

On September 10, 2009, Plaintiff presented to Dr. Jarrett for refill of her prescription medications and complaints of fatigue (R. 349). Her lab work that date was positive for hepatitis C (R. 353-56).

Dr Jarrett discussed Plaintiff's "recent (diagnosis) of Hep C and plan" with Plaintiff on September 22, 2009 (R. 347).

Plaintiff participated in her "first session" of outpatient therapy with Zed Weatherholt, a therapist at Seneca Health Services, Inc., on September 28, 2009. She stated she was "seeking services due to depression." Plaintiff reported "she ha[d] recently been diagnosed with hepatitis C

and that she [was] also to have surgery on her neck." Plaintiff reported she was "actually doing somewhat better [than] she was doing previously; (sic) and that she [was] not as depressed about her diagnosis as she thought she would be." Plaintiff reported she was "trying to remain active and also not allow her thoughts to become irrational or to lead her to choose to depress." Plaintiff was cooperative and her "resistance to treatment [was] mild to moderate." Plaintiff's mood was fair and her affect was stable. Plaintiff was oriented in all spheres; her recent and remote memories were intact; her insight was fair to good; and her judgment was good. Plaintiff was not suicidal or homicidal; she had no thought disorder or psychosis; she had no "specific somatic complaints . . . other than her chronic neck pain and numbness in her arms and hands from her neck problems." Therapist Weatherholt noted Plaintiff was easily engaged and a "therapeutic relationship [was] quickly established." Plaintiff responded "positively" to the "basic tenets of reality therapy." Therapist Weatherholt instructed Plaintiff to receive monthly therapy (R. 577).

Plaintiff underwent a C5-C6 and C6-C7 anterior cervical diskectomy with fusion and plating on October 8, 2009 (R. 298).

On October 20, 2009, Physician Assistant McFadden examined Plaintiff, post surgery. She was afebrile; her incision site was clean, intact, and nontender to palpation; her motor examination was 5/5 and normal; her deep tendon reflexes were normal and symmetrical; her sensation examination was normal except for "a patch dysesthesia of the right hand only"; her gait was normal and without "signs of apraxia"; and her "posterior trapezius region showed some posterior tenderness to her trapezius muscle spasm to palpation." Plaintiff had no neck meningismus and her Kernig's sign was negative. P.A. McFadden opined Plaintiff's "AP and lateral C-spine films appear to be grossly stable . . . ." Plaintiff was "given a one-time prescription of her Percocet." Plaintiff was

instructed to "use moist heat on" her posterior trapezius muscle and medicate with muscle relaxant "as described at discharge." P.A. McFadden recommended Plaintiff "follow up in 1 month's time with AP and lateral C-spine film" (R. 298).

On November 4, 2009, Plaintiff reported to Dr. Jewell that she had "recently been diagnosed with hepatitis C and also had her neck worked on" and that she had "been upset about that but [was] otherwise doing pretty well." Plaintiff medicated with Neurontin and Cymbalta. Her speech, thought process and content, perception and attention were normal. Her affect was full, insight and judgment were intact, and she was alert and oriented, times four (4). Plaintiff had no suicidal or homicidal thoughts. Her mood was described as "euthymic." She was diagnosed with major depressive disorder. Dr. Jewell renewed Plaintiff's prescriptions and noted Plaintiff's "[r]esponse to treatment ha[d] been good" (R. 575).

On November 19, 2009, Dr. Gomez did not complete a Physical Residual Functional Capacity Assessment of Plaintiff because Plaintiff "did not return adls, or ppq or work history on this claim. Notice was sent to claimant as well as the third party. No response at this time from either party. . . . Insufficient evidence to assess this case" (R. 318).

On November 23, 2009, Dr. Smith noted there was "[i]nsufficient [e]vidence" to complete a Psychiatric Review Technique evaluation of Plaintiff. It was noted that Plaintiff "did not return adls, or ppq or work history on this claim. Notice was sent to claimant as well as the third party. No response at this time from either party" (R. 320-32).

On December 3, 2009, Plaintiff reported to Dr. Jarrett that her neck pain was "much improved" after her October 8, 2009, surgery. She was "wearing bone stimulator" (R. 368). Plaintiff medicated high blood pressure with atenolol, and Dr. Jarrett continued that prescription. He

9

prescribed Neurontin for cervical pain, which he noted was "doing well." It was noted she would "see[] gastro next week" (R. 369).

On January 6, 2010, Plaintiff presented to Physician Assistant Adkins, at Seneca Health Services, for a follow-up appointment. Plaintiff stated that she had "a lot going on in her life right now." She reported crying "a lot, feeling helpless and hopeless and worth nothing." Plaintiff denied suicidal thoughts. Plaintiff stated she medicated with Neurontin, and she was "supposed to see a specialist about her Hepatitis C soon . . . ." Plaintiff medicated with Cymbalta and Neurontin. She was ambulatory, cooperative, and appropriate. Her speech, thought process and content, perception and attention were normal. Her affect was full, insight and judgment were intact, and she was alert and oriented, times four (4). Plaintiff had no suicidal or homicidal thoughts. Her mood was described as "depressed." She was diagnosed with major depressive disorder. P. A. Adkins prescribed Wellbutrin and Cymbalta. She noted that Plaintiff had "taken Wellbutrin in the past and it worked well for a long time" (R. 573).

On January 7, 2010, Plaintiff informed Dr. Jarrett that she had sought treatment at Seneca Center for depression, which was caused by her neck pain, and she was trying to get an appointment with the pain clinic. Plaintiff complained of "bad teeth," which caused pain, and "difficulty (with) urination – ha[d] to strain to go." Plaintiff stated she "need[ed] cervical xrays, neck hurts" (R. 366). Dr. Jarrett recommended a cervical x-ray, prescribed Wellbutrin for depression, and noted a "workup in progress (with) Gastro" for hepatitis C (R. 367).

Physician Assistant Adkins, of the Seneca Health Services, Inc., evaluated Plaintiff on February 3, 2010. Plaintiff reported she was "doing better since the addition of Wellbutrin" and she had no "other complaints or concerns." Plaintiff medicated with Cymbalta, Wellbutrin and

Neurontin. She was ambulatory, cooperative, and appropriate. Her speech, thought process and content, perception and attention were normal. Her affect was full, insight and judgment were intact, and she was alert and oriented, times four (4). Plaintiff had no suicidal or homicidal thoughts. She described her mood as "depressed." P. A. Adkins diagnosed depressive disorder, NOS. P. A. Adkins noted Plaintiff would "continue with current medicine regimen." P. A. Adkins opined that Plaintiff's "[r]esponse to treatment ha[d] been good" (R. 571).

Plaintiff presented to Physician Assistant Adkins, at Seneca Health Services, on March 10, 2010, for "reevaluation" because she was "very upset and nervous recently because there [was] a possibility her daughter may have hepatitis." Plaintiff stated her daughter had used her shaving razor and she was "afraid she may have given her daughter hepatitis." Plaintiff stated she "[felt] Cymbalta [was] not helping with depression or anxiety." Plaintiff had no other complaints. P. A. Adkins noted she had not been hospitalized or had attempted suicide. Plaintiff listed her current medications as Cymbalta, Wellbutrin, Neurontin, atenolol, Prevacid, Baclofen, Mobic and "treatment for hepatitis C" (R. 568). Plaintiff was ambulatory, cooperative and appropriate. Her affect was full and her thought process and content, perception, and attention were normal. Her insight was intact; she was oriented, times four (4). Plaintiff described her mood as "depressed." P. A. Adkins' diagnoses were as follows: Axis I - depressive disorder, NOS; Axis IV - occupation and other psychosocial problems; and Axis V - GAF was 54. P. A. Adkins increased Plaintiff's dosage of Cymbalta for one (1) week and then instructed Plaintiff to discontinue medicating with that drug. P. A. Adkins prescribed venlafaxine and continued Plaintiff's prescription for Wellbutrin. Plaintiff was encouraged to "do counseling" as her "[r]esponse to treatment has been good" (R. 569).

On March 11, 2010, Plaintiff presented to a doctor at Pocahontas Medical Practice with

complaints of "carpal tunnel pain" and leg pain, ache and swelling. Plaintiff described her hand "problems" as "joints finger hurt . . . . Was told may be arthritis or carpal tunnel." The diagnosis was for carpal tunnel syndrome (R. 364-65).

Plaintiff presented to the emergency department of Pocahontas Memorial Hospital with lower abdominal pain on March 22, 2010. Plaintiff stated she experienced a "sharp pain . . . when [she] [took] a deep breathe (sic)." Plaintiff's breath sounds were equal and her abdomen was soft. She was neurovascularly intact. Plaintiff was treated with morphine (R. 493-94). Plaintiff was positive for pain (R. 495). Plaintiff was in no acute distress, she was alert and oriented, she had no edema, her motor and sensory functions were normal, her deep tendon reflexes were normal, her speech was normal, she had no gastrointestinal tenderness, and her bowel sounds were normal (R. 496).

Plaintiff's March 22, 2010, CT scan of her abdomen showed "[a]bnormal appearance of the mid descending colon could be an infectious or inflammatory process but a mass of the colon cannot be excluded. Followup colonoscopy recommended." Plaintiff's pelvic CT scan was normal (R. 501).

Plaintiff was transferred from Pocahontas Memorial Hospital emergency department to Davis Memorial Hospital on March 23, 2010, due to "worsening of condition" (R. 493, 503).

On March 23, 2010, Dr. Santra, a physician at Davis Memorial Hospital, noted Plaintiff complained of right lower quadrant abdominal pain, which "started yesterday afternoon"; however, the records from Pocahontas Memorial Hospital showed the pain had begun "four days earlier as a sharp pain and hurt[] her when she [took] a deep breath." Dr. Santra reviewed the CT scan and noted it showed "an infiltration area on the left colon and appendix was visualized. No evidence of appendicitis." The "abnormal appearance of mid descending colon[] could be either infectious or inflammatory process, but a mass of the colon [could] not be excluded." The CT scan showed a

"cystic structure . . . suggesting an ovarian cyst." Plaintiff informed Dr. Santra that she had no diarrhea and had never experienced this pain previously. Plaintiff reported she had hepatitis C, was depressed, and had a musculoskeletal "problem." Plaintiff denied she had shortness of breath or chest pain. Plaintiff reported she medicated with Nexium, Wellbutrin, Effexor, Neurontin, Flexeril and trazodone. Upon examination, Plaintiff was oriented. She had tenderness in the right, lower quadrant of her abdomen, which was "questionable." She had no rebound tenderness. Her abdomen was soft; her bowel sounds were normal (R. 510).

On March 23, 2010, Dr. Santra performed a colonoscopy, with biopsy, of Plaintiff. He found "an area of colitis[1] fairly circumferential or all the way around the ileocecal valve fold and the opposite fold." The "area of concern on the left colon by CT turned out to be normal" (R. 512).

The March 23, 2010, biopsy of Plaintiff's colon tissue showed "benign colonic mucosa with full thickness necrosis, probably ischemic[2]. Fragments of acute inflammation and necrosis. Fragments of colonic mucosa showing focal cryptitis, otherwise within normal limits" (R. 529).

During Plaintiff's hospital stay, it was noted that Plaintiff rested well and had no complaints of pain or distress. She was medicated with morphine (R. 523, 533).

Upon discharge from David Memorial Hospital on March 25, 2010, Plaintiff was diagnosed with abdominal pain. She was medicating with Lorcet, Keflex, Flagyl, Nexium, Wellbutrin, Effexor, Neurontin, Trazodone, and Flexeril (R. 508-09).

On March 29, 2010, Plaintiff reported to Dr. Leveaux that Nexium was "not working." She

_____

[1]Inflammation of the colon. Dorland's Illustrated Medical Dictionary, 384 (32d ed. 2012)

[2]Type of colitis cause by acute vascular insufficiency of the colon. Symptoms include pain, bloody diarrhea, low-grade fever, abdominal distention and tenderness and sometimes ulceration. Id.

complained of having "a lot of problems (with her) stomach." Dr. Leveaux diagnosed colitis and ordered a colonoscopy (R. 362). He diagnosed gastroesophageal reflux disease (R. 363).

Plaintiff presented to Physician Assistant Adkins, at Seneca Health Services, Inc., for a "follow up visit . . . " in April 2010. Plaintiff stated she felt depressed because she had been "recently told she had a cyst on her kidney and a cyst on her ovary." Plaintiff informed P.A. Adkins that her brother medicated with Abilify and "she would like to try that." Plaintiff stated that venlafaxine had "helped some and she want[ed] to continue that also." Plaintiff had "no other complaints or concerns at [that] time." Plaintiff informed P. A. Adkins that she was "supposed to be taking trazodone . . . at night for insomnia, but ha[d] not had this for a while." Plaintiff was ambulatory, cooperative, and appropriate. Her speech was normal, her affect was full, her thought process and content were normal, she was alert and oriented, her attention was satisfactory, and her judgment was intact. Plaintiff's perception was normal. Plaintiff described her mood as "depressed." P.A. Adkins diagnosed depressive disorder, NOS. P.A. Adkins continued Plaintiff on Wellbutrin and venlafaxine and prescribed Trazodone and Abilify (R. 566).

On April 26, 2010, Plaintiff presented to Dr. Leveaux with complaints of shoulder pain, colitis, neck pain, and headaches. Plaintiff was scheduled to see a neurologist the following day (R. 360). Dr. Leveaux prescribed Flexeril and Lortab (R. 361).

Plaintiff's April 29, 2010, cervical spine x-rays showed "good alignment" and evidence of the "prior surgery" (R. 490).

Plaintiff's April 29, 2010, x-ray of her lumbar spine was normal (R. 491).

On May 14, 2010, Plaintiff presented to the emergency department of Pocahontas Memorial Hospital with complaints of "trembling, shaking of arms & difficulty with memory" (R. 477). She

had no fever, pain, nausea, or vomiting. She limped and had numbness, paresthesias, and shortness of breath (R. 479). Plaintiff was in no acute pain or distress; her memory was intact; she was anxious and depressed; her eyes, ears, nose, throat, neck respiratory, cardiovascular, neurologic and skin examinations produced normal results. Plaintiff had "CVA tenderness." She had no adenopathy of her neck; her digits were "normal" and she was neurovascularly intact (R. 480).

Plaintiff's May 14, 2010, chest x-ray was normal (R. 485). Plaintiff's head CT scan was normal (R. 486).

On June 8, 2010, Plaintiff presented to Dr. Winters, at Greenbrier Valley Medical Center, to establish care. Plaintiff reported gastrointestinal pain, nausea, diarrhea, five (5) migraine headaches per week, chest pain, rapid heart beat, dysuria, frequent urination, "less" neck/back pain, and shortness of breath. Plaintiff reported sleep disturbances and depression. She stated she was suicidal and experiencing domestic violence (R. 589). Dr. Winters noted Plaintiff was in no acute pain or distress; she was alert and oriented; her neurological examination was normal; her cardiovascular examination was normal; her respiratory examination was normal; she experienced muscular spasm and tenderness in her cervical and thoracic spines. Dr. Winters diagnosed "chronic pain management," degenerative disk disease of cervical spine, GERD, hypertension, and colitis. She prescribed Lodine, Zanaflex, Lyrica, Opana, oxycodone, and Dexilant (R. 590).

Plaintiff was admitted to Greenbrier Valley Medical Center on the evening of June 15, 2010, for abdominal pain, nausea, vomiting, and blood in her stool. She was treated by Dr. Finder. It was noted that Plaintiff's ulcerative colitis had been "more or less stable" since her March 2010 diagnosis. It was noted that Plaintiff was "hepatitis C positive, most likely received from homemade tattoos" (R. 596). Upon examination, Plaintiff had no fevers, chills, chest pain, shortness of breath,

cough, dysuria, hematuria, numbness, or tingling. Plaintiff was in no acute distress; she was " a bit uncomfortable." Plaintiff was afebrile; her vital signs were stable. Plaintiff's abdomen had "some nonspecific diffuse tenderness without mass, guarding, or rebound." Plaintiff's musculoskeletal examination was normal (R. 596). Her strength on flexion and extension was 5/5. Her neck was supple and nontender (R. 594). Her cranial nerves were grossly intact (R. 596). Dr. Finder diagnosed ulcerative colitis,[3] abdominal pain, urinary tract infection, and degenerative disk disease. Dr. Finder medicated Plaintiff with Dilaudid, Nexium, Levaquin, Ambien, Tenormin, and nicotine patch (R.595). Plaintiff was placed on "observation" (R. 596).

The June 16, 2010, CT scan of Plaintiff's abdomen and pelvis showed "ascites with colonic wall thickening on the right. Prominent lymph nodes. Report essentially correlates with virtual radiologic." A follow-up CT scan was recommended (R. 598).

Upon Plaintiff's release from the Greenbrier Valley Medical Center on June 17, 2010, Dr. Fogle noted Plaintiff had not undergone any consultative examinations while hospitalized. Dr. Fogle noted Plaintiff's CT scan "show[ed] thickening of her abdominal wall, mainly on the right." Plaintiff was stable. She was released. She was instructed to continue medicating with her "normal home medications." She was prescribed Flagyl, Cipro and prednisone (R. 592).

On June 23, 2010, Plaintiff presented to Dr. Winters for a follow-up to her hospitalization for flare of ulcerative colitis. Plaintiff reported she still experienced diarrhea and had "some nausea" (R. 587). Dr. Winter noted Plaintiff was in no acute pain or distress; her gastrointestinal examination produced tenderness; her neurological examination was normal; and her cardiovascular system was

---

[3]Chronic, recurrent ulceration in the colon. . . manifested clinically by cramping abdominal pain, rectal bleeding, and loose discharges of pus, blood, and mucus.

normal. Dr. Winters diagnosed ulcerative colitis "flare," increased Plaintiff's dosage of Opana, and prescribed sulfasalazine and Protonix (R. 588).

On June 24, 2010, Dr. Winters completed a Department of Health and Human Resources Physician's Summary form. The diagnoses were ulcerative colitis, neck pain and hypertension. Plaintiff's prognosis was poor; her "incapacity/disability" was expected to last for more than one (1) year. She was limited in lifting and standing (R. 552, 604).

On July 1, 2010, Plaintiff presented to Dr. Winters for a follow-up examination and refills of her prescription medications. Plaintiff reported that she had experienced nausea, vomiting, and diarrhea since she had been released from the hospital. She reported she had not been eating. Plaintiff stated she was dizzy when she stood up and she was "still having" abdominal pain (R. 585). Plaintiff was in no acute pain or distress; she was alert and oriented; her abdomen was tender. Dr. Winters referred Plaintiff to "Digestive Health" for treatment of colitis, weight gain, and hepatitis C. She prescribed oxycodone and Opana (R. 586).

On July 29, 2010, Dr. Nitesh Ratnakar at "Digestive Health" completed a "New Patient Intake Form" for Plaintiff. Plaintiff stated she experienced vomiting, diarrhea, abdomen pain, bleeding, hepatitis C, "real low sugar," and ulcerative colitis. She stated her "diarrhea need[ed] diagnosis." Plaintiff stated she medicated with atenolol, Kapidex, oxycodone, sulfasalazine, gabapentin, Opana, and bupropion (R. 561). Dr. Ratnakar's assessment was for "recently diagnosed with ulcerative colitis. Following at UVA. Hep C? . . . H/O depression . . . . Fatty liver." Plaintiff was referred to "hepatology at UVA for evlauat[ion]" (R. 563).

On August 16, 2010, Plaintiff presented to Physician Assistant Plank, at Pocahontas Medical Practice, with complaints of low blood sugar. She reported she had been "out of meds" since August

13, 2010. She was crying and "nervous"; she requested that P.A. Plank assist her in finding "a new pain doctor if possible." Upon examination, Plaintiff was positive for nausea, diarrhea, gastrointestinal pain, vomiting, blood in stool, neck pain, back pain, insomnia, and depression (R. 559). Plaintiff was prescribed Lopressor for hypertension, Kapidex for GERD, Neurontin for low back pain, and Ultram. P.A. Plank noted Plaintiff should "get back on Cymbalta" for depression and should "get back on sulfasalazine for ulcerative colitis." P. A. Plank discussed Plaintiff's poor diet and meal frequency in relation to her hypoglycemia (R. 560).

Plaintiff participated in outpatient therapy with Zed Weatherholt, a therapist at Seneca Health Services, Inc., on August 23, 2010. Plaintiff reported she had not "been seen for therapy for the past several months" and was "still having some issues related to her depression and that her depression appear[ed] to be connected to all of the physical problems that she" had at the time of the therapy. Plaintiff reported she was "no longer taking any pain medication with the exception of Ultram" and she was "hopeful that she [would] be able to avoid having to restart any opiates." She "agree[d] to continue to use [self evaluation model of reality therapy] to manage her depression." Plaintiff's mood was fair; her affect was stable. She was oriented; her recent and remote memories were intact; her insight was "fair to good"; her judgment was good; and she had "no specific somatic complaints." Therapist Weatherholt noted Plaintiff "appear[ed] to be making some mild to moderate progress learning to use the self evaluation model of reality therapy to manage her depression more effectively" (R. 564).

At the September 8, 2010, administrative hearing, Plaintiff testified she quit working because her duties were "bothering [her] neck really really bad in my back." Plaintiff stated she was unable to work due to "always hurting" and she was "always sick." Plaintiff stated she was "always tired

18

and weak" and she "stay[ed] sick to" her "stomach a lot . . ." (R. 36). Plaintiff testified her job as a cook caused pain in her neck and back (R. 48). Plaintiff testified she had to move furniture as part of her job as a house cleaner; she could no longer lift and carry due to pain (R. 49-50). Plaintiff testified she could not lift her three (3) year old granddaughter, who weighted thirty (30) pounds "without hurting" (R. 51).

Plaintiff testified that Neurontin caused her mouth to be dry (R. 36). Plaintiff testified that the pain medication did not always "take away that pain that [shot] down [her] leg to the bottom of [her] feet," which, she "guess[ed] [was caused by] something[] pinching against [her] sciatic nerve" (R. 43). Plaintiff took trazodone to sleep (R. 40). Plaintiff rated her neck pain, at the time of the administrative hearing, at eight (8) on a scale from one-to-ten (1-10). Plaintiff rated her pain at four (4) after she took pain medication. Plaintiff rated her back pain at seven (7) or eight (8) at the time of the administrative hearing and at four (4) after she took pain medication (R. 43). Plaintiff testified she treated her ulcerative colitis with sulfasalazine and "another stomach medicine" (R. 44). Plaintiff testified she had not been medicated for hepatitis C but had been referred to the hepatology department at the University of Virginia for treatments (R. 45).

Plaintiff testified she did not drive a car because her license had been revoked due to a driving-under-the-influence conviction. She stated she intended to "take the schooling and try to get them [her driver's license] back within the next couple of months." Plaintiff testified she belonged to no clubs or organizations; she did not attend church. Her brother and mother visited her and family members telephoned her (R. 37). Plaintiff testified she used to camp, swim and canoe but no longer engaged in those activities. Plaintiff stated she slept until 11:00 or 11:30 a.m. (R. 38). She did not eat upon rising due to her being "sick when" she "first [got] up." She stated she was

instructed to eat every two (2) hours to control the symptoms of her ulcerative colitis, but she could not, due to being "sick to [her] stomach" (R. 38-39). Plaintiff did laundry on "good" days. She attempted to keep her "house clean and stuff, but it's hard . . . . It depresses me because I'm a pretty clean person and . . . I can't do the things I used to be able to do." Plaintiff testified she watched television throughout the day and had no difficulty "following the storyline or the topics" of her favorite program, "NCIS." She could not sit through the whole hour, however, because she "constantly" went to the bathroom (R. 39). Plaintiff stated she went to the bathroom hourly. Plaintiff retired between 11:00 p.m. and midnight (R. 40). Plaintiff could not "color the velvet pictures with [her] girls," garden, or can vegetables because she "never hardly [felt] good" (R. 56-57). Plaintiff could button shirts and zip zippers with her right hand (R. 42). Plaintiff could pick up change. She testified she dropped items "at least twice a week" (R. 43).

Plaintiff stated she could walk "25 to 50 feet . . . lately" but could walk two (2) blocks in 2008 (R. 45). Plaintiff testified she could sit for thirty (30) minutes to one (1) hour. She testified that her arms and neck "hurt[] really bad" when she attempted to braid her hair and her reaching "too long to try – grab a hold of something" caused neck pain (R. 46). Plaintiff testified she could not sit comfortably (R. 55).

Plaintiff testified her neck felt as if it was "constantly burning and aching" (R. 40). Plaintiff's back hurt through the center part of her back to below her sciatic nerve. Plaintiff reported she experienced hand numbness, arm numbness, and arm and hand swelling in her right hand "[a]lmost everyday (sic)" and sometimes in her left arm and hand (R. 41). Plaintiff testified that her neck "felt a lot better like right after" she had surgery on it, but it began burning and hurting all the time during the "past few months." Plaintiff stated it was difficult for her to turn her head; she had headaches

at least three (3) times a week (R. 42).

Plaintiff testified the colitis symptoms began during March, 2010; however, she had experienced "stomach problems . . . for a long time for like acid reflux and stuff" (R. 44). Plaintiff stated she "stay[ed] upset all the time, seclude[d] [herself] from others, . . . [could not] think straight a lot, just worr[ied] about everything" due to her depression (R. 45). Plaintiff testified her hepatitis C viral load was "2.6 million . . . the other day" (R. 51). Plaintiff stated hepatitis C caused her to be "weak." Plaintiff stated she had been diagnosed with bronchial asthma, which caused "breathing problems." She had been instructed to cease smoking and had done so recently. She testified she had difficulty urinating (R. 52). Plaintiff testified she had "accidents" relative to diarrhea (R. 53). She also testified she had rheumatoid arthritis in her hands (R. 58).

The following question/answer exchange occurred between the ALJ and the VE:

ALJ: For the first hypothetical, assume an individual who has the same age, education, and work experience as the claimant and has residual functional capacity to perform work at a low exertional level as defined by the regulations subject to the following limitations: no overhead reaching with the upper extremity; only occasional fine manipulation with the right hand; should avoid moderate exposures to extremes of hot and cold temperatures, humidity, and vibrations. Would an individual with the above limitations be able to perform the claimant's past work either as he or she actually performed the work as those occupations are generally performed in the national economy (R. 61).

VE: No, Your Honor. . . (R. 61).

ALJ: . . . . Assume the above vocational functions and limitations, are there, in your opinion, other jobs in the national or regional economy that such an individual can perform? (R. 61).

VE: Based on the hypothetical, yes, Your Honor, . . . . Under light work, mail clerk, non postal . . . [in the region] 2,800; in the nation over 300,000. Counter clerk . . . numbers in the region over 2,500; in the nation over 290,000. And ticket taker . . . numbers in the region over 1,900; in the

nation over 230,000. . . (R. 62).

ALJ:   . . . . And if the individual was further limited to perform simple routine
       tasks because they could not do complex tasks, would that have an effect on
       the above jobs named? (R. 62).

VE:    No, Your Honor, other than in my opinion, this is not in the DOT but in my
       opinion, those number would need to be reduced by 30% to take that into
       account (R. 62).

The ALJ asked a final hypothetical, adding that the individual would also need three to four

additional breaks to use the bathroom for approximately five minutes per time in addition to normal

breaks and lunch periods.  The ALJ testified the jobs would not be available under those

circumstances (R. 63).

## III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's

regulations at 20 C.F.R. §§ 404.1520 and 416.920,  ALJ Wolfe made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act
       through September 30, 2010 (R. 13).

2.     The claimant has not engaged in substantial gainful activity since January 1,
       2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)
       (R 13).

3.     The claimant has the following severe impairments: degenerative disc disease
       of the cervical spine and major depressive disorder (20 CFR 404.1520(c) and
       416.920(c) (R. 14).

4.     The claimant does not have an impairment or combination of impairments
       that meets or medically equals one of the listed impairments in 20 CFR Part
       404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526,
       416.920(d), 416.925 and 416.926) (R. 14).

5.     After careful consideration of the entire record, the undersigned finds that the
       claimant has the residual functional capacity to perform light work as defined
       in 20 CFR 404.1567(b) and 416.967(b) except no overhead reaching with the

right upper extremity, only occasional fine manipulation with right hand, must avoid moderate exposure to extremes of hot/cold temperatures, humidity and vibrations; and cannot do complex tasks, but can do simple routine tasks (R. 15).

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965) (R. 18).

7.  The claimant was born on March 21, 1968 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963) (R. 19).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964) (R. 19).

9.  Transferability of job skills is not material to the determination of disability because using the Medical Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 81-41 and 20 CFR Part 404, Subpart P, Appendix 2) (R. 19).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)) (R. 19).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2008, through the date of the decision (20 CFR 404.1520(G) and 416.920(g)) (R. 20).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v.

NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

The Plaintiff contends:

1. The decision of the Commissioner is in error because it fails to find her gastric conditions of hepatitis C and ulcerative colitis as severe impairments (Plaintiff's brief at p. 7).

2. The decision of the Commissioner is not based on substantial evidence because it relies entirely on a residual functional evaluation (RFC) determined solely by the Administrative Law Judge (Plaintiff's brief at p. 9).

3. The decision of the ALJ, which was adopted by the Commissioner, failed to consider all the medically determinable impairments when determining Ms. Sheet's residual functional capacity (Plaintiff's brief at p. 11).

4. The Commissioner's determination that Ms. Sheets' statements regarding intensity, persistence and limiting effects of her pain are not credible is not supported by substantial medical evidence (Plaintiff's brief at p. 12).

The Commissioner contends:

1. The ALJ properly determined that Plaintiff's alleged gastric conditions were not severe impairments under the Act.

2.  The ALJ properly considered all the evidence in the record, and her RFC determination is based on substantial evidence.

3.  The ALJ properly considered all credibly established limitations when making her RFC determination.

4.  The ALJ's assessment of Plaintiff's credibility is supported by substantial evidence.

## C.  Severe Impairments

Plaintiff first argues the decision of the Commissioner is in error because it fails to find her gastric conditions of hepatitis C and ulcerative colitis as severe impairments. Defendant contends that the ALJ properly determined that Plaintiff's alleged gastric conditions were not severe impairments under the Act.

The Fourth Circuit has held:

> [A]n impairment can be considered as "not severe" *only* if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.

Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1985)(emphasis in original).

Plaintiff presented to the ER with lower abdominal pain on March 22, 2010. She had already been diagnosed with Hepatitis C. A CT scan was abnormal, showing what could be an infection or inflammation or a mass. It also showed what could be an ovarian cyst. A colonoscopy was recommended. The colonoscopy showed "an area of colitis fairly circumferential or all the way around the ileocecal valve fold and the opposite fold. A biopsy of the area showed benign colonic mucosa with full thickness necrosis, probably ischemic; fragments of acute inflammation and necrosis; and fragments showing focal cryptitis. Plaintiff was medicated with morphine. She was diagnosed with colitis and gastroesophageal

reflux disease ("GERD").

Plaintiff presented to Dr. Winters in June 2010. She diagnosed (among other ailments) GERD and colitis.

Plaintiff was admitted to the hospital on June 15, 2010, for abdominal pain, nausea, vomiting, and blood in her stool. It was noted that her "ulcerative colitis" had been "more or less stable" since her March diagnosis. Dr. Finder diagnosed ulcerative colitis, abdominal pain, urinary tract infection, and degenerative disk disease. An abdominal CT scan showed "ascites with colonic wall thickening . . .and prominent lymph nodes."

Plaintiff followed up with Dr. Winters on June 23, 2010, for what was diagnosed as a "flare of ulcerative colitis." On June 24, Dr. Winters completed a DHHR Physician Summary Form, stating that Plaintiff was diagnosed with ulcerative colitis, neck pain, and hypertension. Her prognosis was poor and her incapacity/disability expected to last for more than one year. She would be limited in lifting and standing.

On July 1, 2010, Plaintiff told Dr. Winters she still experienced, nausea, vomiting and diarrhea, and had not been eating. She was dizzy when she stood, and was still having abdominal pain. Dr. Winters referred her to the "Digestive Health" department. On July 29, 2010, Dr. Ratnaker of the "Digestive Health" department assessed "recently diagnosed with ulcerative colitis; Hep C?; and fatty liver," and referred her to hepatology for evaluation of her Hepatitis.

On August 16, 2010, Plaintiff was positive for nausea, diarrhea, gastrointestinal pain, vomiting, and blood in stool.

At the Administrative Hearing held September 8, 2010, Plaintiff testified she "stayed

sick to her stomach a lot." She was sick when she first got up in the morning. She said she was instructed to eat every two hours to control the symptoms of her ulcerative colitis, but she could not do so due to being sick to her stomach. She could not sit through an entire television program because she "constantly" went to the bathroom – at least hourly. She testified she had had "accidents" relative to diarrhea.

The ALJ found Plaintiff's only severe impairments were degenerative disc disease of the cervical spine and major depressive disorder. Regarding her ulcerative colitis, the ALJ stated it was not severe because it was "controlled with diet and medication." She noted Plaintiff's diagnosis of Hepatitis C, but states "there are no limitations as a result of this condition." As already quoted:

> [A]n impairment can be considered as "not severe" *only* if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.

The evidence indicates that Plaintiff's ulcerative colitis is more than a "slight abnormality" having such a "minimal effect" that it would not be expected to interfere with her ability to work. The undersigned therefore finds substantial evidence does not support the ALJ's determination that Plaintiff's gastrointestinal impairments, in particular her ulcerative colitis were not severe.[4]

Even if Plaintiff's gastrointestinal problems were properly found to be "not severe," her ulcerative colitis and hepatitis C are medically-determinable impairments. She has been

_____

[4]This is not to say that the colitis is disabling, even in combination with her other impairment, only that the evidence shows it has more than a minimal effect.

diagnosed with these impairments by several treating and examining physicians, some specialists, through laboratory testing, including a colonoscopy, biopsy, and blood tests. She has been treated with medications for the impairment. She has been hospitalized on more than one occasion for "flares" of her ulcerative colitis. As stated in the Act:

> In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity.

42 U.S.C. section 423(d)(2)(B). Further:

> If an ALJ finds a claimant has a severe impairment or combination of impairments, the ALJ must consider all of the claimant's impairments, including non-severe impairments and the limitations imposed by all of the claimant's impairments, at the remaining steps of the sequential analysis.

Id. Finally, in determining a claimant's Residual Functional Capacity ("RFC"), the ALJ must consider the combined effect of both severe and nonsevere medically-determinable impairments:

> [W]e will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity.

20 C.F.R. section 404.1545(e)

A review of the Decision shows the ALJ did not consider Plaintiff's ulcerative colitis through the remaining steps of the sequential analysis.

## D. RFC

Plaintiff next argues the decision of the Commissioner is not based on substantial evidence because it relies entirely on a residual functional evaluation (RFC) determined

solely by the ALJ. Defendant contends the ALJ properly considered all the evidence in the record, and her RFC determination is based on substantial evidence.

Having already found substantial evidence does not support the ALJ's determination that Plaintiff's ulcerative colitis was not a severe impairment and that the ALJ erred by not considering Plaintiff's ulcerative colitis through the remaining steps of the sequential evaluation, including her RFC, it follows that substantial evidence does not support the ALJ's Residual Functional Capacity assessment. The undersigned therefore does not address the issue of whether the ALJ may assess a claimant's RFC based only on the raw medical evidence, without any medical opinions.

### E. Medically Determinable Impairments

Plaintiff next argues the decision of the ALJ, which was adopted by the Commissioner, failed to consider all the medically determinable impairments when determining Ms. Sheets' residual functional capacity. Defendant contends the ALJ properly considered all credibly established limitations when making her RFC determination.

The undersigned has already found substantial evidence does not support the ALJ's decision because she failed to consider Plaintiff's gastrointestinal impairments through the steps of the sequential evaluation, including her RFC.

### F. Credibility

Plaintiff next argues the Commissioner's determination that Ms. Sheets' statements regarding the intensity, persistence and limiting effects of her pain are not credible is not supported by substantial medical evidence. Defendant contends the ALJ's assessment of Plaintiff's credibility is supported by substantial evidence.

The undersigned has already found that substantial evidence does not support the ALJ's determination that Plaintiff's ulcerative colitis was a non-severe impairment, and also found the ALJ erred by not considering Plaintiff's medically-determinable impairment of ulcerative colitis through the remainder of the sequential evaluation. It follows that substantial evidence does not support the ALJ's credibility finding.

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in <u>Craig v. Chater</u>, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .
>
> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

<u>Craig</u>, <u>supra</u> at 594. Here the ALJ finds that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . .," thus meeting the first step of the

analysis. The ALJ was therefore required to take into account "all the available evidence" in evaluating credibility. The undersigned has already found that Plaintiff's ulcerative colitis is a medically-determinable impairment. Regarding Plaintiff's colitis, the ALJ noted Plaintiff's testimony that she "had stomach problems with acid reflux and in March was found to have colitis;""She now takes medication three times a day and may have to have surgery; "has diarrhea and sometimes has accidents when she cannot get into the bathroom;""she watches television but needs to go to the bathroom or get something to drink during the shows;" and "does not eat every two hours like she is supposed to."[5]

The ALJ then finds:

[T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

In terms of the claimant's alleged impairments, the claimant had complaints of headaches and numbness from chronic neck pain. The MRI did confirm the herniated nucleus pulposus at C5-C6 and C6-see seven [sic]. The claimant did undergo surgery and the post surgery examination in October 2009 showed some tenderness to the trapezius and patchy dysesthesia of the right-hand [sic], but otherwise full motor strength and a good result on physical examination. She had reported her pain much improved in December 2009 (Exhibit 9F). There was a good status on cervical x-rays in 2010 (Exhibit 10F). The reports in Exhibit 14F indicate that the claimant's major depressive disorder is improved with medication.

As in the ALJ's RFC, there is no mention of Plaintiff's alleged symptoms from ulcerative colitis or why those symptoms are not credible. This is significant because in response to a

---

[5]Although true that Plaintiff testified she did not eat every two hours "like she was supposed to," she explained that she could not eat every two hours because she "stay[ed] sick to [her] stomach." Regarding using the bathroom, she testified she was not able to sit through a whole hour show because she was "constantly going to the bathroom. It's gotten worse here lately. It just - - going to the bathroom or getting something to drink." When asked how often she needed to use the bathroom she answered: "I go about every hour at least."

hypothetical from the ALJ, the Vocational Expert testified that "if an individual further needed three to four additional breaks to use the bathroom for approximately five minutes per time in addition to normal breaks and lunch periods," jobs would not be available. In <u>Koonce v. Apfel</u>, 166 F.3d 1209 (4th Cir 1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record. The ALJ herself asked this hypothetical, but never discussed this limitation in her decision, or why she ultimately rejected it or any limitation related to Plaintiff's alleged gastrointestinal impairments.

The undersigned finds substantial evidence does not support the ALJ's determination that Plaintiff's statements concerning her symptoms are not credible.

By this conclusion, the undersigned does not make any finding regarding whether Plaintiff's ulcerative colitis, alone or in combination with her other impairments, is disabling, what, if any, functional limitations it might cause, or if it, alone or in combination with her other impairments, meets the durational requirement.

## V. RECOMMENDATION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment [Docket Entry 14] be **DENIED,** Plaintiff's Motion for Judgment on the Pleadings [Docket Entry 10] be **GRANTED in part,** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation, and this matter be dismissed from the Court's active docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and

Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _30_ day of _March_, 2012.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE